United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>HSUAN BIN CHEN, *et al.*,<br><br>        Defendants.<br>                                    / | No. CR 09-110 SI<br><br>**ORDER DENYING DEFENDANTS'<br>MOTIONS TO DISMISS THE<br>INDICTMENT AND FOR A BILL OF<br>PARTICULARS** |

On December 9, 2010, the Court held a hearing on defendants' motions to dismiss the indictment and for a bill of particulars. For the reasons set forth below, the Court DENIES both motions.

**BACKGROUND**

The superseding indictment filed on June 10, 2010 charges AU Optronics Corporation, AU Optronics Corporation America, and nine Taiwanese individuals with entering into and engaging in a price-fixing conspiracy in violation of Section 1 of the Sherman Act. Six of the individuals charged were, during the period covered by the indictment, employees of AU Optronics Corporation. Those defendants are Hsuan Bin Chen (President), Hui Hsuing (Executive Vice President), Lai-Juh Chen (Director of Desktop (Monitor) Display Business Group), Shui Lung Leung (Senior Manager of Desktop (Monitor) Display Business Group), Borlong Bai (Senior Manager of Notebook Display Business Group and Director of the Notebook Display Business Group), and Tsannrong Lee (Senior Manager of IT Display, Senior Manager of Desktop Display, Director of Desktop Display, and Director of Notebook Display Business Groups).

The superseding indictment alleges that "[f]rom on or about September 14, 2001, until on or

about December 1, 2006 ('the period covered by this Indictment'), . . . the defendants and other coconspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') in the United States and elsewhere." Superseding Indictment ¶ 2. According to the indictment, "[t]he charged combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and other coconspirators, the substantial terms of which were to agree to fix the prices of TFT-LCDs for use in notebook computers, desktop computer monitors, and televisions in the United States and elsewhere." *Id*. ¶ 3.

The indictment alleges, *inter alia*, that on or about September 14, 2001, representatives from four Taiwan TFT-LCD manufacturers, including AU Optronics Corporation, "secretly met in a hotel room in Taipei, Taiwan and entered into and engaged in a conspiracy to fix the price of TFT-LCD." *Id*. ¶ 17(a). The indictment alleges that the conspirators agreed to meet approximately once a month for the purpose of fixing the price of TFT-LCD panels, and that these meetings were commonly referred to by some of the conspirators as "Crystal Meetings." *Id*. According to the indictment, at the September 14, 2001 meeting, a representative from AU Optronics Corporation stated that the participants at future "Crystal Meetings" should include the two major Korean TFT-LCD manufacturers to ensure the success of the conspiracy. *Id*. The indictment alleges that employees from AU Optronics Corporation attended Crystal Meetings on a regular basis between on or about September 14, 2001 until on or about December 1, 2006 with employees of other participating TFT-LCD manufacturers. *Id*. ¶ 17(c). The indictment alleges that all of the individual AUO defendants except Lai-Juh Chen attended and participated in one or more of the Crystal Meetings, and that all of the individual AUO defendants at times authorized, ordered or consented to the attendance and participation of their subordinate employees at Crystal Meetings. *Id*. ¶ 17(d).

The indictment alleges, *inter alia*, that "[t]he participants in the conspiracy issued price quotations in accordance with the price agreements and accepted payment for the supply of TFT-LCDs sold at collusive, noncompetitive prices to customers in the United States and elsewhere." *Id*. ¶ 17(f). The indictment also alleges that "[i]n or about the spring [of] 2006, the participants in the Crystal Meetings became further concerned about being detected after receiving news reports of an ongoing

price-fixing investigation by the United States Department of Justice into the dynamic random access memory ('DRAM') industry and after receiving other information about a possible investigation into the TFT-LCD industry. To further avoid detection and keep the meetings secret, the conspiracy members, including representatives of defendant AU Optronics Corporation, agreed to no longer meet as a group, but instead have back-to-back, one-on-one meetings with each other on a certain date each month at restaurants and cafes in Taipei, Taiwan." *Id*. ¶ 17(I). Through these meetings, participants continued to exchange shipment, production, and pricing information in furtherance of the alleged conspiracy. *Id*.

According to the indictment, employees of AU Optronics Corporation also had one-on-one discussions in person or by telephone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States. *Id*. ¶ 17(j). The indictment alleges that the six individual AUO defendants participated in these one-on-one discussions. *Id*. The indictment also alleges that "senior-level employees of AU Optronics Corporation regularly instructed employees of AU Optronics Corporation America located in the United States to contact employees of other TFT-LCD manufacturers located in the United States to discuss pricing to major United States TFT-LCD customers. . . . These AU Optronics Corporation America employees regularly reported the pricing information they received from their competitor contacts in the United States to senior-level executives at AU Optronics Corporation in Taiwan. By at least early 2003, representatives of defendant AU Optronics Corporation also began sending reports of the discussions and price agreements reached at Crystal Meetings to certain employees at AU Optronics Corporation America. These reports were used by certain employees of AU Optronics Corporation America in their price negotiations with certain TFT-LCD customers located in the United States." *Id*. ¶ 17(k).

Defendant Hsuan Bin Chen, joined by the corporate AUO defendants and four of the individual AUO defendants, has moved to dismiss the indictment on the ground that the indictment "fails to allege that Mr. Chen acted with the knowledge that his conduct, all of which occurred overseas, would likely cause anticompetitive effects in the United States." Defendants AUO and AUOA, joined by four of the individual AUO defendants, have moved for a bill of particulars, arguing that the indictment is so

conclusory and vague that it is impossible for defendants to prepare an adequate defense.

## DISCUSSION

**I.    Motion to dismiss**

Relying on *Metro Industries Inc. v. Sammi Corporation*, 82 F.3d 839 (9th Cir. 1996), defendants contend that Sherman Act violations based entirely on foreign conduct are subject to a rule of reason analysis. Then, relying on the holding in *United States v. U.S. Gypsum Company*, 438 U.S. 422 (1978), regarding the intent requirement in criminal antitrust rule of reason cases, defendants argue that in a criminal antitrust case based entirely on foreign conduct, the government must allege and prove that the defendant acted with the knowledge that his conduct would likely cause anticompetitive effects in the United States.

In *Metro Industries*, an importer sued a foreign export company and two of its domestic subsidiaries alleging, *inter alia*, that a Korean design registration system which gave Korean producers an exclusive right to export a registered product design for three years constituted market division that was a *per se* violation of the Sherman Act. The Ninth Circuit held that *per se* treatment was inappropriate under the facts of that case:

> The Korean registration system is not a classic horizontal market division agreement in which competitors at the same level agree to divide up the market for a given product. Metro does not point to, and we have not found, a single instance in which an arrangement similar to the Korean manufacturer-exporter design registration system has undergone judicial scrutiny in the Sherman Act context. The novelty of this arrangement "strongly supports application of rule-of-reason analysis."

*Id*. at 844 (internal citation omitted). The court also noted that there was no evidence in the record, which included a bench trial, that the registration system had the purpose or effect of restraining trade, which also militated against extension of the *per se* rule. *Id*. The Ninth Circuit further held, "Even if Metro could prove that the registration system constituted a 'market division' that would require application of the *per se* rule if the division occurred in a domestic context, application of the *per se* rule is not appropriate where the conduct in question occurred in another country." *Id*. at 844-45. Defendants' motion to dismiss the indictment is based on this statement in *Metro Industries*. Defendants contend that *Metro Industries* holds that all Sherman Act cases based on foreign conduct are rule of

reason cases.

Defendants then argue that *Metro Industries*, in combination with the United States Supreme Court's holding in *United States v. U.S. Gypsum Company*, 438 U.S. 422 (1978), means that in a criminal antitrust case based entirely on foreign conduct, the government must allege and prove that the defendant acted with the knowledge that his conduct would likely cause anticompetitive effects in the United States. In *Gypsum*, the Supreme Court held that in a criminal prosecution under the Sherman Act that was subject to rule of reason analysis, "action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws." *Gypsum*, 438 U.S. at 444.

Price fixing is generally considered a *per se* violation of the antitrust laws. *United States v. Trenton Potteries*, 273 U.S. 392 (1927); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003). In *United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991), the Ninth Circuit held that the intent requirement of *Gypsum* does not apply to charges of *per se* violations of the antitrust laws:

> "Where *per se* conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the *per se* rule is designed to avoid."

*Id.* at 1046 (quoting *United States v. Koppers Co.*, 652 F.2d 290, 296 n.6 (2d Cir. 1981)). Thus, in a *per se* case the government need not prove a defendant's intent to produce anticompetitive effects. *Id.*

The government argues that the indictment is sufficient as pleaded, and that defendants' reliance on *Metro Industries* is misplaced. The Court agrees. As the government argues, *Metro Industries* arose in a very different context. The alleged restraint in *Metro Industries* involved a "previously unexamined business practice," and the court found that the "novelty of this arrangement" required the rule of reason analysis. *Metro Industries*, 82 F.3d at 844. *Metro Industries* did not address the question presented here, namely the *mens rea* standard in a criminal antitrust price fixing prosecution involving foreign conduct.

The Court finds instructive *United States v. Nippon Paper Industries Company*, 109 F.3d 1 (1st Cir. 1997). In *Nippon Paper*, the United States brought a criminal action against a Japanese corporation, alleging that it had conspired to fix the prices of facsimile paper sold in the United States. The district

court dismissed the indictment on the ground that Section One of the Sherman Act does not cover wholly extraterritorial conduct in the criminal context. The First Circuit reversed, and held "Section One of the Sherman Act applies to wholly foreign conduct which has an intended and substantial effect in the United States." *Id*. at 9. Defendants emphasize the "intended and substantial effect" language in *Nippon* to argue that *Nippon* supports their contention that the *Gypsum mens rea* standard applies in a criminal prosecution based on foreign conduct. However, the *Nippon* court used the "intended and substantial effect" language in the context of holding that the district court had jurisdiction over a criminal prosecution based on wholly foreign price-fixing. *Nippon* did not hold that in such a criminal prosecution, the *Gypsum mens rea* standard applies.

In fact, the *Nippon* court stated exactly the opposite. In *Nippon*, the defendant argued that the presumption against extraterritoriality operated with greater force in the criminal arena than in civil litigation. *Id*. at 6. The First Circuit rejected that argument:

> Nor does *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), offer aid and succor to NPI. Recognizing that "the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct," *id*. at 440-41, 98 S.Ct. at 2875, the *Gypsum* Court held that criminal intent generally is required to convict under the Act. *See id*. at 443, 98 S.Ct. at 2876-77. Although this distinguishes some civil antitrust cases (in which intent need not be proven) from their criminal counterparts, the *Gypsum* Court made it plain that intent need not be shown to prosecute criminally "conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects." *Id*. at 440, 98 S.Ct. at 2875. This means, of course, that defendants can be convicted of participation in price-fixing conspiracies without any demonstration of a specific criminal intent to violate the antitrust laws. *See, e.g.*, *United States v. Brown*, 936 F.2d 1042, 1046 (9th Cir. 1991); *United States v. Society of Indep. Gas. Marketers*, 624 F.2d 461, 465 (4th Cir. 1979), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *United States v. Gillen*, 599 F.2d 541, 544-45 (3d Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). Because the instant case falls within that rubric, *Gypsum* does not help NPI.

*Id*. at 6-7. Thus, the *Nippon* court rejected the argument that a criminal prosecution for wholly foreign price-fixing conduct falls within the rubric of *Gypsum*.

Accordingly, for the foregoing reasons, the Court DENIES defendants' motion to dismiss the indictment.

## II. Motion for bill of particulars

Defendants contend that a bill of particulars is necessary because the indictment is "so

6

conclusory and vague as to make it impossible for defendants to prepare an adequate defense." AUO Motion at 1:13-14. Defendants emphasize that the government has made five discovery productions totaling approximately 42 million pages of material, and they argue that defendants should not and cannot be required to dig through this discovery to discover the "missing details" of the government's allegations. Defendants argue that the indictment is deficient because it does not include, except for a few examples, allegations specific to each of the defendants. Defendants contend that the indictment does not provide any guidance as to what each of the defendants allegedly did in furtherance of the conspiracy.

Defendants seek a bill of particulars requiring the government to provide the following[1]: (1) the identities of coconspirators and meeting participants, (2) the specific locations where the conspiracy functioned, where conspiratorial meetings took place, and what conspiratorial acts and statements were made, (3) information about the meetings attended and the statements the defendants made at those meetings, (4) the "overt acts" engaged in by the participants of the conspiracy, (5) information about customers, including names, specific LCD products purchased and the countries to which the products were sold, (6) information about the "price quotations" mentioned in the indictment, such as what the prices were, when the quotations were issued, which products did the price quotations cover, what other terms were offered in addition to price, which of the price quotations were the defendants aware of, when and how did the defendants become aware of such quotations, and when and how did the defendants become aware that such quotations were part of the conspiracy, and (7) the basis for the gross gains derived from the conspiracy and the identities of persons who suffered gross losses.

The government responds that the indictment is detailed and provides defendants with adequate notice of the charges against them. The government also states that before the indictment was returned, the government explained the charges against defendants in separate meetings with each of their counsel. Tewksbury Decl. ¶ 2. During these meetings, the government shared certain evidence, and counsel had the opportunity to ask questions. *Id*. In addition, the government states that in the course of its investigation, lawyers from the Antitrust Division have interviewed many witnesses, and in each

---

[1] This is a summary of the particulars requested by all defendants. The moving defendants have requested numerous distinct, and sometimes overlapping, particulars.

case, paralegals prepared interview reports or memoranda:

> The interview reports typically provide detailed information on the following topics: employment history; pricing procedures; the witness' contacts with TFT-LCD competitors; a description of the witness' communications with competitors, including discussions on market pricing and pricing to customers; the time and place of meetings with competitors; the witness' knowledge of competitor contacts by others; their knowledge of the antitrust laws and state of mind while they were engaged in the in the conspiratorial conduct; and the DOJ investigation.

*Id*. ¶ 3. An example of one of the interview reports is filed under seal as Exhibit 1 to the Tewksbury Declaration; the report is 44 pages and contains substantial detail, including identifying by Bates number every document shown to the witness during the interview. The government states that it has provided approximately 87 reports of witness interviews, including interviews of co-conspirators who have pled guilty and other employees of companies who have pled guilty. *Id*. ¶ 4.

In addition, the discovery produced to defendants has included (1) grand jury transcripts with exhibits, (2) the application and supporting FBI affidavit for the warrant to search AUOA's offices in Houston, Texas, (3) transcripts of merits witness depositions taken in the class action litigation (the government provided an index of the CD containing these deposition transcripts including the name of the witness, the witness' title and organization, the type of document, and the date the deposition was taken), (4) FBI 302s, (5) immunity letters, compulsion orders and cooperation agreements, (6) plea agreements for all of the companies and individuals that have pled guilty, and (7) the agreement between the government and the company that was granted leniency. The government asserts that while it is true that the government has turned over voluminous discovery, the vast majority of documents are in electronic form and were produced in word searchable tiff/text or native format. *Id*. Thus, according to the government, defendants can type in their names or email addresses, or the name of any witness, and the database will identify documents with that name in it.[2] For the documents produced in hard copy, the government provided an index containing the names of witnesses, their titles, type of document, and corresponding bates pages. *Id*.

---

[2] The government also states that AUO's counsel recently raised an issue about the electronic searchability of foreign language characters in a subset of the produced electronic documents. According to Ms. Tewksbury, the government has met and conferred with AUO and AUO's counsel in an attempt to understand the issue, and the government is in the process of reproducing a subset of the electronic production which should resolve the issue. Tewksbury Decl. ¶ 4.

8

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court may in its discretion require a bill of particulars where necessary to inform the defendant of the charges against him, to minimize the danger of surprise at trial, to prepare for the defense, and to protect against double jeopardy. *See United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1984). The Ninth Circuit has held that, in deciding whether to order a bill of particulars, a court "should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government." *Id.* In addition, "[a] defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979). A bill of particulars is designed to "minimize the danger of surprise at trial and to provide sufficient information on the nature of the charges to allow preparation of a defense." *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984). There is no need for a bill where "the indictment itself provides sufficient details of the charges and if the Government provides full discovery to the defense." *Id.* The district court is vested with "very broad discretion in ruling upon requests for such bills." *Will v. United States*, 389 U.S. 90, 99 (1967).

The Court concludes that defendants are not entitled to a bill of particulars. The indictment adequately advises defendants of the charges against them, and defendants seek extremely detailed evidence to which they are not entitled through a bill of particulars. As one court has noted, "[a] bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (internal citations omitted, emphasis in original).

Here, the indictment sets forth the dates of the conspiracy and the specific time periods each of the defendants are alleged to have participated in it, a description of the type of antitrust conspiracy charged and the specific types of TFT-LCD covered by the indictment, a description of the goals of the conspiracy, as well as a detailed description of the means and methods by which those goals were to be accomplished. The indictment is far more detailed than other indictments that prior Ninth Circuit cases have found to be sufficient. *See, e.g.*, *United States v. Miller*, 771 F.2d 1219, 1226-27 (9th Cir. 1985) (upholding an indictment that charged "a continuing conspiracy existed for a period of about five years,

1   '[b]eginning at least as early as January 1978, and continuing until at least October 1982.' [and that
2   listed] the actions which the co-conspirators took to form and carry out the conspiracy (i.e., discussions
3   by telephone or at meetings at defendants' business premises, bars, restaurants, and gasoline stations
4   which they owned, operated or at which they controlled the retail prices of gasoline), and charges that
5   the defendants attempted to enforce adherence to their price-fixing scheme by informing other
6   competitors of the conspirators' agreements, personally and by telephone.").

The Court agrees with the government that the indictment need not specify the overt acts committed in furtherance of the charged conspiracies, and that it is unreasonable to require the government to "state the circumstances under which, and the words or conduct by means of which" defendants and every alleged co-conspirator entered into the alleged conspiracies. *See United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985) (defendants not entitled to bill of particulars in order to obtain names of unknown co-conspirators, exact date on which alleged conspiracy began, or statement of all overt acts), *amended on other grounds*, 777 F.2d 543 (1985); *see also Miller*, 771 F.2d at 1226 ("An indictment charging a violation of section one of the Sherman Act is not required to allege any overt act. . . . Because the Sherman Act punishes the mere act of conspiring, overt acts in furtherance of the conspiracy need not be alleged.").

The Court also finds that the discovery provided to defendants obviates the need for a bill of particulars. While the discovery is voluminous, the government has provided it in a fashion designed to help defendants prepare their defense. The government began production of discovery as soon as the defendants and the Court signed a protective order. The government conducted separate meetings with defense counsel explaining the charges against each defendant. Importantly, the discovery produced thus far has included approximately 87 highly detailed interview reports. In addition, the government has indexed both hard copy and electronic documents, and produced electronic discovery in a searchable format.[3]

---

[3] The Court notes that defendant Tsannrong Lee, who joined in AUO's motion and seeks supplemental particulars aside from those specified in AUO's motion, recently filed a motion to modify the conditions of his pretrial release. Docket No. 210. In that motion, defendant Lee states, *inter alia*, that defendant undertaken an initial review of the evidence against him, and the motion discusses that evidence in great detail. *Id.* at 7-15.

**United States District Court**
For the Northern District of California

Moreover, as the government notes, the individual defendants have stated to the Court that they are familiar with the allegations against them. In pleadings and at hearings in connection with proceedings related to pretrial release, defendants have stated that they have known about the charges and core evidence against them for years due to the related criminal cases and the parallel civil cases. *See* Tewksbury Decl. ¶ 5 (quoting statements of defense counsel at these hearings and statements from defendants' pleadings). Indeed, in those proceedings some defendants represented that they had already formulated their defenses, statements that are incompatible with their current position.

Accordingly, defendants' motions for a bill of particular are DENIED.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motions to dismiss and for a bill of particulars. (Docket Nos. 169, 172, 174, 176-182, & 185)

**IT IS SO ORDERED.**

Dated: January 28, 2011

SUSAN ILLSTON
United States District Judge